La Jueza Asociada Señora Pabón Charneco
emitió la opinión del Tribunal.
Ésta pudiera ser una determinación “no simpática”, pero no actuamos para ganarnos simpatías, sino para resolver conforme a derecho.(1)
Existen ocasiones en que las controversias que llegan hasta este Tribunal contienen, en su fondo, aspectos que trascienden el remedio solicitado por las partes. La contro-versia expuesta en el recurso de epígrafe es un ejemplo particularmente excepcional de esas ocasiones.
*844 El caso de autos nos obliga a enfrentarnos a interrogan-tes complejas cuya resolución pudiera tener efectos que van más allá de lo solicitado por la señora AAR (en ade-lante, la peticionaria o AAR). Se trata de aspectos que cuestionan el rol constitucional de este Tribunal y los en-tendidos básicos sobre los cuales se sustenta todo nuestro ordenamiento jurídico. El asunto que hoy tenemos ante nuestra consideración nos coloca, no por vez primera, ante la ardua tarea de proveer una respuesta a la interrogante de hasta dónde se extienden los poderes de la Rama Judicial en el sistema democrático de Puerto Rico. No debe que-dar duda de que, en su esencia, el caso de autos trata sobre quién tiene el Poder para gobernar en nuestro ordena-miento constitucional. Como siempre, debemos acercarnos al proceso para contestar esta interrogante según el enten-dido básico de que “en nuestro ordenamiento constitucio-nal democrático, todo poder tiene límites”. P.I.P. v. E.L.A. et al., 186 D.P.R. 1, 77 (2012), opinión disidente de Fiol Matta, J.
Hoy comparece ante nos la señora AAR y nos solicita que revisemos una Sentencia emitida por el Tribunal de Apelaciones. En esta, el foro apelativo intermedio confirmó una decisión del Tribunal de Primera Instancia en la cual se denegó la petición de adopción presentada por la peti-cionaria para adoptar a la menor JMAV. Esta última es la hija biológica de la señora CW, quien es a su vez la com-pañera sentimental de la señora AAR.(2)
La peticionaria nos solicita que revisemos si en nuestro ordenamiento jurídico se permite que una persona adopte a un menor cuando esta es del mismo sexo del padre bio-lógico del menor, y sin que con ello se den por terminados los vínculos filiales entre el menor y su padre biológico.
Antes de adentrarnos a resolver la controversia jurídica *845 planteada en este caso, pasemos a exponer los hechos que le dieron génesis.
I
Según consta en los autos, la peticionaria y la señora CV. han mantenido una relación sentimental por aproxi-madamente veinte (20) años. En algún momento de su re-lación, AAR y CW acordaron comenzar un proceso de fertilidad. La señora CW procedió entonces a participar de un procedimiento de inseminación artificial, el cual tuvo como resultado el nacimiento de la menor JMAV el 17 de julio de 2000.
Ambas mujeres acordaron compartir las tareas y res-ponsabilidades que conllevan la crianza de la menor JMAV. Posteriormente, ambas acordaron que AAR debería adop-tar a JMAV en aras de proveerle la oportunidad de contar con dos (2) madres legales. Así las cosas, el 7 de junio de 2005 la peticionaria presentó una solicitud de adopción ante el Tribunal de Primera Instancia, Sala Superior de San Juan. En esta solicitó adoptar a la menor JMAV sin que ello conllevara que se dieran por terminados los víncu-los jurídicos de la menor con su madre biológica CW. De hecho, la señora CW acompañó junto a la petición de adopción de la peticionaria una Declaración Jurada en la que consintió a la adopción pero manifestó que con ello no renunciaba a sus derechos biológicos y a los vínculos de filiación que la unían a su hija JMAV.
Para sustentar su petición, la señora AAR invocó la fi-gura de Second Parent Adoption, o Adopción por Padre o Madre Funcional, que había sido utilizada en varias juris-dicciones de Estados Unidos para permitir adopciones de menores por parte de parejas del mismo sexo. En la alter-nativa, la peticionaria argumentó que si se determinaba que la figura de Second Parent Adoption no era aplicable a nuestra jurisdicción, el Art. 138 del Código Civil de Puerto *846 Rico, que prohíbe la adopción de menores por parte de per-sonas del mismo sexo del padre de estos, sería inconstitu-cional según la Cláusula de Igual Protección de las Leyes y por violar su derecho constitucional a la intimidad.
Posteriormente, el 30 de agosto de 2005 la Procuradora de Asuntos de Familia compareció ante el foro de instancia mediante un Informe Fiscal y se opuso a la petición de adopción. Sustentó su oposición en que el texto de los Arts. 137 y 138 del Código Civil, 31 L.P.R.A. secs. 538 y 539, prohíben expresamente que una persona del mismo sexo del padre del menor adopte a este último, sin que se extin-gan los vínculos filiales entre el menor y su padre biológico. Además, la Procuradora de Asuntos de Familia sostuvo que nuestro ordenamiento jurídico en cuanto al tema de la adopción por parejas del mismo sexo se encontraba en un estado de incertidumbre, por lo que permitir la adopción solicitada crearía una relación de filiación igualmente vulnerable en detrimento del mejor bienestar de la menor JMAV.
Luego de varios incidentes procesales, el foro de instan-cia emitió una sentencia el 20 de junio de 2007 en la que denegó la adopción solicitada. En síntesis, el Tribunal de Primera Instancia entendió que la peticionaria no cumplió con los requisitos jurisdiccionales que establecen los Arts. 137 y 138 del Código Civil, supra, por lo que carecía de jurisdicción para permitir la adopción solicitada. En cuanto al argumento de la inconstitucionalidad de esas dis-posiciones estatutarias, el foro de instancia rehusó aten-derlas, ya que concluyó que la peticionaria no lo esbozó formalmente.
Insatisfecha, el 18 de octubre de 2007 la peticionaria presentó un recurso de apelación ante el Tribunal de Apelaciones. En este sostuvo su argumento en cuanto a que la figura de Second Parent Adoption es compatible con el ordenamiento jurídico actual. Además, adujo que el foro de instancia erró al no considerar en los méritos el ataque *847 a la constitucionalidad de los Arts. 137 y 138 del Código Civil, supra, y por no considerar el mejor bienestar de la menor al momento de denegar la adopción solicitada.
Subsiguientemente, el 29 de agosto de 2008 el Tribunal de Apelaciones emitió una Sentencia en la que confirmó la determinación del Tribunal de Primera Instancia. El foro apelativo intermedio razonó que, a pesar de que la legisla-ción de adopción vigente persigue el propósito de flexibili-zar el procedimiento de adopción, esa flexibilización es para con los menores de edad y no va dirigida a hacer más fácil a los adoptantes cumplir con los requisitos jurisdiccio-nales necesarios para permitir una adopción. Así las cosas, determinó que la figura del Second Parent Adoption no es compatible con el texto de los artículos pertinentes del Có-digo Civil en materia de adopción, por lo que no podía ser aplicada en nuestro ordenamiento. En cuanto al argu-mento de la inconstitucionalidad de estos artículos, el tribunal a quo compartió la conclusión del foro de instancia en cuanto a que la peticionaria no presentó formalmente su ataque constitucional a estas disposiciones estatutarias.
Inconforme, la peticionaria presentó un recurso de cer-tiorari ante este Tribunal el 13 de noviembre de 2008 y argumentó la comisión de los errores siguientes:
Erró el Tribunal de Apelaciones al no considerar el señala-miento de la inconstitucionalidad de los artículos 137 y 138 del Código Civil en su aplicación, a pesar de que desde la presen-tación de la Petición de Adopción, como alternativa a la apli-cación de la figura de la adopción sucesiva o Second Parent Adoption se impugnó su constitucionalidad.
Erró el Tribunal de Apelaciones al no aplicar la figura de la adopción sucesiva o Second Parent Adoption, para salvar así la constitucionalidad de las disposiciones legales que regulan la adopción.
Erró el Tribunal de Apelaciones al denegar la Petición de Adopción e ignorar considerar el mejor bienestar de la menor en un caso de adopción. Petición de certiorari, pág. 5.
Examinado el recurso, el 13 de mayo de 2009 acordamos expedir. Las partes han presentado sus respectivos alega- *848 tos y ante el interés público de la controversia involucrada en el caso de autos, hemos contado con la participación, en calidad de amicii curiae, de la American Civil Liberties Union, del Colegio de Abogados de Puerto Rico, de la Sexuality and Gender Law Clinic de la Escuela de Derecho de la Universidad de Columbia, del profesor de derecho Carlos A. Del Valle Cruz, de la National Center for Lesbian Rights, de la Academia Americana de Pediatría, Capítulo de Puerto Rico, de la Escuela de Medicina de Puerto Rico, Departamento de Pediatría, de la Asociación de Psicología de Puerto Rico, de la Coalición Ciudadana en Defensa de la Familia y de la Alianza de Juristas Cristianos. Con el be-neficio de la comparecencia de todos, estamos en posición de resolver sin ulterior trámite.
II
Previo a adentrarnos de lleno en la controversia consti-tucional que tenemos ante nos hoy, consideramos prudente realizar un breve repaso en cuanto a uno de los principios sobre el cual se cimenta nuestro esquema constitucional: la Doctrina de Separación de Poderes. Ello en aras de recor-dar la diferencia fundamental que debe existir entre el es-trado del Tribunal Supremo y el hemiciclo de los Cuerpos Legislativos, particularmente en un caso como el de epí-grafe en el que debemos tener claros los límites del Poder.
Se ha dicho que “la doctrina de separación de poderes ... es difícil de comprender. Tanto en la teoría como en la prác-tica, está permeada por sutilezas, ironías y aparentes contradicciones”. (Traducción nuestra). L. Fisher, American Constitutional Law, 6ta ed., Durham, Ed. Carolina Academic Press, 2005, Vol. 1, pág. 161. Aunque podemos encontrar abundante discusión en cuanto a esta doctrina en los tomos de Decisiones de Puerto Rico, frecuentemente este Tribunal la ha utilizado en el vacío, limitándose a des-cribirla en sus vertientes más sencillas. Véanse: Córdova y *849 otros v. Cámara Representantes, 171 D.P.R. 789 (2007); Acevedo Vilá v. Aponte Hernández, 168 D.P.R. 443 (2006); Delgado, Ex parte, 165 D.P.R. 170 (2005). Ante ello, resulta útil dedicar algunas páginas al principio constitucional de separación de poderes, para evitar la tentación de caer en la lamentable práctica de mencionarlo como un mero estri-billo jurídico.
A. Orígenes de la Doctrina
Hemos sostenido que “el concepto de separación de poderes es más ‘una doctrina política’ que ‘una regla técnica de derecho’ ”. Colón Cortés v. Pesquera, 150 D.P.R. 724, 751 (2000), citando a F. Frankfurter y J.M. Landis, Power of Congress over Procedure in Criminal Contempts in “Inferior” Federal Courts — A Study in Separation of Powers, 37 Harv. L. Rev. 1010, 1012-1014 (1924). Así, la Doctrina de Separación de Poderes fue concebida primordialmente por filósofos de la ciencia política que, en el transcurso de siglos, desarrollaron los cimientos de la doctrina que sostiene todo nuestro ordenamiento constitucional.
Diversos pensadores han intentado explicar las razones por las cuales el ser humano se constituye en el ordena-miento político que conocemos como el Estado. Durante la antigua Grecia, los filósofos Platón y Aristóteles suscribie-ron obras en las cuales describieron cómo debía consti-tuirse un Estado conforme a los principios de la Justicia. L. Strauss, Plato, en L. Strauss y J. Cropsey, History of Political Philosophy, 3ra ed., Chicago/Londres, The University of Chicago Press, 1987, págs. 33-87; C. Lord, Aristotle, id., págs. 134-154. Estos pensadores ya adelantaban la inescapable aspiración humana por desarrollar el mejor modelo teórico de organización estatal.
Sin embargo, el devenir de la historia humana obligó a los pensadores políticos a sustituir su búsqueda de un es-tado ejemplar por la construcción de una teoría de gobierno *850 en la cual se protegería con prioridad la libertad de los ciudadanos. Es por esto que la moderna Doctrina de Sepa-ración de Poderes es hija del liberalismo imperante en Europa en los Siglos XVII y XVIII. En particular, los filósofos políticos de esa época enfocaron sus estudios en maneras de evitar que los Estados se convirtieran en vehículos de tiranía. Véanse: J.M. Kelly, A Short History of Western Legal Theory, Oxford, Oxford University Press, 1992, pág. 278; R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. Prog, de Educ. Jur. Cont. U.I.P.R., 1997, Vol. I, pág. 573.
Fue durante esa época que el británico John Locke teo-rizó sobre los propósitos del Estado y argumentó que la razón primordial por la que los individuos sacrificaban parte de su libertad para someterse a las reglas de un Es-tado político era para proteger el derecho a su propiedad privada. J. Locke, Two Treatises of Civil Government, en C. Morris, The Great Legal Philosophers, Philadelphia, University of Pennsylvania Press, 1959, pág. 152. Para ese fin, Locke adelantó las bases de lo que subsiguientemente se convertiría en la Doctrina de Separación de Poderes.
Según Locke, para que el Estado como estructura polí-tica pudiese cumplir su fin de garantizar la protección de la propiedad de los ciudadanos era necesario que el poder estuviese dividido entre diferentes entes, ya que no consi-deraba sabio que las personas que ostentaran el poder de hacer leyes también pudieran ejecutarlas. R.A. Goldwin, John Locke en Strauss y Cropsey, op. cit., pág. 501. A esos fines, Locke consideraba obligatorio para un buen Estado que el poder legislativo estuviese separado del poder ejecutivo. Sin embargo, nada precisó Locke en cuanto al poder judicial.
Fue entonces el filósofo francés Charles Secondat, Baron de Montesquieu, quien años después suscribió una teo-rización más completa de la Doctrina de Separación de Poderes. A diferencia de Locke, Montesquieu consideraba *851 que el fin último de cualquier estructura estatal era garan-tizar la libertad política de sus ciudadanos. A esos fines, Montesquieu coincidió con Locke en que el poder debía es-tar dividido entre diferentes entes, porque de lo contrario “toda persona a quien se le delegue poder estará propensa de abusar de este... [p]ara prevenir este abuso, es necesa-rio... que el poder sea un freno al poder”. (Traducción nuestra). B. Montesquieu, The Spirit of the Laws, en The Great Legal Philosophers, op. cit., pág. 169. De suerte que es Montesquieu quien generalmente se reconoce como el padre de la Doctrina de Separación de Poderes moderna. Su modelo de división de poderes en tres (3) ramas —eje-cutiva, legislativa y judicial— es el que inspiró la mayoría de los modelos constitucionales actuales.
B. La Doctrina de Separación de Poderes moderna
La Constitución de Estados Unidos, producto de la Asamblea Constituyente de 1787, fue el documento en el que por primera vez se decidió llevar a cabo el experimento de poner en práctica la Doctrina de Separación de Poderes según la concibió Montesquieu, pero adaptada a las dificul-tades intrínsecas que conlleva el crear una estructura es-tatal para una comunidad política diversa y de considerable extensión geográfica. Véase M. Diamond, The Federalist, en Strauss y Cropsey, op. cit., págs. 659-678.
Con las incuestionables influencias de los escritos de Montesquieu, la Constitución de Estados Unidos reflejó, en parte, la Doctrina de Separación de Poderes según fue con-cebida por este.(3) A través de sus diversos artículos, clara-mente se establecieron tres (3) ramas de gobierno, cada una con diferentes responsabilidades y con un ámbito de acción delimitado. Sin embargo, ese documento constitu- *852 cional que hoy reconocemos como paradigma de la aplica-ción de la Doctrina de Separación de Poderes no estuvo exento de críticas al momento de su adopción.(4)
Precisamente en cuanto a la separación de poderes se-gún concebida en la Constitución surgió división en Esta-dos Unidos al momento de presentarse esta a los estados para su ratificación. Críticos argumentaron que el modelo de separación de poderes de Montesquieu no funcionaría en un país de gran extensión geográfica como lo era Esta-dos Unidos. A su vez, argumentaron que existía demasiado poder compartido entre las Ramas. M. Diamond, The Federalist, en Strauss y Cropsey, op. cit., pág. 663.
En las páginas de una serie de ensayos conocidos como The Federalist Papers, James Madison, Alexander Hamilton y John Jay se dieron a la tarea de rebatir, inter alia, esta crítica a la Constitución. En particular, Madison de-dicó varios ensayos a defender la separación de poderes según quedó plasmada en el documento constitucional. Así, dijo que “a menos que las ramas estén tan mezcladas y conectadas como para que cada una tenga el control cons-titucional sobre las otras, el grado de separación que se requiere para el funcionamiento de un gobierno libre nunca podrá ser mantenido”. (Traducción nuestra). J. Madison, The Federalist Papers, No. 48, Nueva York, Ed. Arlington House, 1966, pág. 308. Con esto, ya Madison ade-lantaba la inescapable realidad de que la Doctrina de Separación de Poderes según la concibió Montesquieu, no podría aplicarse en la práctica como un inexorable axioma en el cual el ámbito de poder de las tres (3) ramas estu-viese delimitado de forma absoluta.
A tales efectos, la Constitución de Estados Unidos creó un sistema de pesos y contrapesos, mediante el cual las tres (3) ramas ostentarían algún nivel de poder compartido *853 que, a su vez, funcionaría como freno para que una de es-tas no pudiese asumir demasiado poder como para domi-nar a las otras. Es decir, un ámbito de la Doctrina de Se-paración de Poderes según adoptada en la Constitución de Estados Unidos conllevaba tanto una separación explícita como implícita del poder entre las ramas.
Como corolario de este sistema, Madison era consciente que la naturaleza intrínseca del sistema de separación de poderes adoptado en la Constitución de Estados Unidos ocasionaría que los dirigentes de las ramas intentaran ex-pandir su ámbito de poder para así dominar a las otras. Después de todo, los constituyentes reconocían que “[s]i los hombres fuesen ángeles, el estado no sería necesario. Si los ángeles fuesen a gobernar a los hombres, no sería necesa-rio tener controles internos y externos para el estado”. (Traducción nuestra). J. Madison, The Federalist Papers, No. 51, op. cit., pág. 322.
Entre las tres (3) ramas, Madison no albergaba dudas de cuál era la más peligrosa: la Legislativa. Según este, la rama legislativa constantemente busca expandir su ámbito de operación e intenta atraer todo el poder político a su centro. J. Madison, The Federalist Papers, No. 48, op. cit., pág. 309. Según Madison, las otras dos (2) ramas serían menos peligrosas ya que su ámbito de operación estaría cla-ramente delimitado. (Traducción nuestra). Id., pág. 310.
En cuanto a cuál de las tres (3) ramas sería la menos peligrosa, los constituyentes también estaban claros. Otro de los autores de The Federalist Papers, Alexander Hamilton, suscribió contundentemente que la Rama Judicial era la menos peligrosa, ya que “no tiene ni fuerza ni voluntad, sino meramente poder de juicio; y en última instancia de-pende de la rama ejecutiva para darle eficacia a sus juicios”. (Traducción nuestra). A. Hamilton, The Federalist Papers, No. 78, op. cit., pág. 465.
De suerte que, a final de cuentas, la Doctrina de Sepa-ración de Poderes según fire adoptada en la Constitución *854 de Estados Unidos, se basó en un supuesto teórico: la natu-raleza humana llevaría a que las personas a cargo de cada una de las ramas intentaran usurpar el poder de las otras, pero el sistema constitucional permitiría que las violaciones constitucionales de una rama fueran lo suficientemente evi-dentes como para que las otras la contrarrestaran. Así, el esquema constitucional quedó sustentado en una descon-fianza de la naturaleza humana. Por ende, además de ser un ingrediente para la fórmula de buen gobierno, indirec-tamente la Doctrina de Separación de Poderes aspira a regular la interacción de los seres humanos en una sociedad.
C. Situación actual de la Doctrina
Demás está decir que la Doctrina de Separación de Po-deres según concebida en la Constitución de Estados Uni-dos fue la misma que se adoptó en Puerto Rico mediante el proceso constitucional de 1952. J.J. Alvarez González, De-recho constitucional de Puerto Rico y relaciones constitucio-nales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 237. El devenir del tiempo, así como la expansión del rol que ha experimentado el estado moderno, ha causado el cuestionamiento de la Doctrina de Separación de Poderes por parte de algunos sectores. Véase C.M. Hardin, The Separation of Powers Needs Major Revision, en R.A. Goldwin y A. Kaufman, Separation of Powers Does It Still Work?, Washington, D.C., Ed. American Enterprise Institute for Public Policy Research, 1986, págs. 90-117.
La mayoría de estas críticas a la doctrina no van dirigi-das a cuestionar su necesidad en nuestro sistema constitu-cional, sino a ventilar una frustración por la aparente in-eficiencia en la forma de gobernar que es causada cuando el ámbito de poder de las ramas está separado. Fisher, op. cit., pág. 161. El propio Tribunal Supremo de Estados Uni-dos reconoció esta realidad temprano en el Siglo XX al ex-presar que la Doctrina de Separación de Poderes se adoptó “no para promover la eficiencia, sino para evitar el ejercicio *855 arbitrario del poder”. (Traducción nuestra). Myers v. United States, 272 U.S. 52, 293 (1926).
No obstante todas estas críticas, es incuestionable que la Doctrina de Separación de Poderes es parte esencial del sistema de gobierno que hemos adoptado como comunidad política. Como Tribunal de última instancia, no podemos ceder a la tentación de obviar ese sagrado principio, o uti-lizarlo a la ligera como un estribillo jurídico. Debemos ser siempre conscientes de las delicadas fronteras constitucio-nales que existen entre las tres (3) ramas del gobierno. Es nuestra obligación velar por el rol de la Rama Judicial en aras de evitar trastocar los principios de la separación de poderes y echar al suelo el entendimiento básico de quienes concibieron a esta rama como la menos peligrosa de las tres (3). Debemos ser conscientes que, al igual que las ramas hermanas, la Rama Judicial no está exenta de violaciones a los principios de separación de poderes. Véase J.W. Nowlin, Conceptualizing the Dangers of the “Least Dangerous” Branch: A Typology of Constitutional Violation, 39 Conn. L. Rev. 1211 (2007). Después de todo, la descon-fianza en la naturaleza humana que yace en los cimientos de la Doctrina de Separación de Poderes también debe ser de aplicación a esta Rama.
Conscientes de este trasfondo doctrinal, pasemos a dilu-cidar la controversia planteada ante este Tribunal en el caso de autos. Los argumentos de índole constitucional que tenemos ante nuestra consideración requieren un sosegado análisis de los poderes de la Rama Judicial y de su rol en el esquema constitucional puertorriqueño. Así, y al igual que en otras ocasiones, debemos contestar las interrogantes ju-rídicas siguientes:
¿Sobre quién recae la responsabilidad de hacer viable el re-clamo de [la peticionaria]? ¿Sobre la Rama Judicial a través de un pronunciamiento jurisprudencial o, por el contrario, sobre las ramas políticas del Gobierno mediante la correspondiente legislación? ¿No entraña esta determinación, en su esencia misma, un asunto de política pública sobre cómo el Estado *856 debe responder a los reclamos de unas personas tradicional-mente incomprendidas y marginadas por la sociedad, legis-lando los requisitos y las garantías pertinentes que tal recono-cimiento necesariamente conlleva? ¿Cuál es el proceso más efectivo de deliberación y reflexión democrática que permita conjurar todos los intentos que interrelacionan en una contro-versia de esta naturaleza? (Énfasis suplido). Delgado, Ex parte, supra, pág. 181, Opinión de Rodríguez Rodríguez, J.
De manera pausada y sosegada, pasemos a analizar la controversia de autos, teniendo presente lo que hasta ahora hemos discutido.
III
El caso de autos requiere que evaluemos varios aspectos relativos a la figura de la adopción en nuestro ordenamiento. Ello de acuerdo con el derecho positivo apli-cable, nuestros precedentes y los principios que inspiran esa figura.
A través de la institución de la filiación se establecen y regulan en nuestro ordenamiento los derechos y obligaciones que existen entre personas que ostentan vínculos biológicos. R. Serrano Geyls, Derecho de familia de Puerto Rico y legislación comparada, San Juan, Ed. Prog. de Educ. Jur. Cont. U.I.P.R., 2002, Vol. II, págs. 885-886. Nuestro ordenamiento jurídico reconoce dos (2) tipos de filiaciones: la natural y la adoptiva. La filiación natural implica un vínculo biológico entre las personas, el cual tiene el efecto de generar una serie de derechos y obligaciones entre las personas que compartan ese tipo de filiación.
Por otro lado, la filiación adoptiva surge mediante un acto jurídico solemne, en el cual luego de una ruptura total del vínculo jurídico existente entre un individuo y sus padres biológicos, se forma una nueva filiación entre este y las personas que han expresado su voluntad para adoptarlo como hijo. Beníquez et al. v. Vargas et al., 184 D.P.R. *857 210, 233 (2012); López v. E.L.A., 165 D.P.R. 280, 299 (2005). La figura se sustenta en una ficción jurídica cuyo fin es crear los mismos derechos y obligaciones que existen entre padres e hijos que ostenten filiación natural. López v. E.L.A., supra; Zapata et al. v. Zapata et al., 156 D.P.R. 278, 286 (2002).
Su existencia en nuestro ordenamiento persigue diversos fines. Por un lado, busca proveer a los menores que por alguna razón no tengan padres la oportunidad de vivir, criarse y educarse en un hogar adecuado. Zapata et al. v. Zapata et al., supra, págs. 286-287. Por otro, "facilita a aquellas personas que loablemente han optado por acoger a dichos niños como si fueran biológicamente suyos, para atenderlos y brindarles el calor y la estabilidad de una familia funcional”. Id. pág. 287. No obstante, es indudable que el fin primordial que aspira a proteger la figura de la filiación adoptiva es el mejor bienestar del menor. López v. E.L.A., supra, págs. 300-301; Zapata et al. v. Zapata et al., supra, pág. 287; Virella v. Proc. Esp. Rel. Fam., 154 D.P.R. 742, 754 (2001).
Debido a los eminentes intereses estatales presentes en esta figura, el proceso para constituir una filiación adop-tiva está rigurosamente reglamentado. López v. E.L.A., supra, pág. 299. En su vertiente sustantiva, el proceso de adopción es regulado por diversos artículos del Código Civil de Puerto Rico.(5) Por su parte, en su vertiente procesal la adopción es regulada por la Ley de Procedimientos Es-peciales, la cual fue enmendada de manera extensiva me-diante la aprobación de la Ley Núm. 186-2009 (8 L.P.R.A. sec. 1051), conocida como Ley de Reforma Integral de Pro-cedimientos de Adopción de 2009.(6)
*858 En cuanto a la interpretación de las normas sustantivas que regulan la figura de la adopción, hemos establecido que deben interpretarse de manera liberal a favor del adoptando. López v. E.L.A., supra, pág. 303. No obstante, “la liberalidad en la interpretación no puede conducirnos ni a violentar la intención legislativa ni a consagrar absurdos”. Rivera Coll v. Tribunal Superior, 103 D.P.R. 325, 331 (1975). A su vez, hemos sostenido que no existe un derecho fundamental a adoptar, por lo cual las restricciones que se impongan al procedimiento de adopción estarán sujetas a un escrutinio de racionalidad mínima, siempre y cuando no afecten derechos fundamentales. López v. E.L.A., supra, pág. 307.
Por otra parte, debido al alto interés público y los asuntos sensitivos subyacentes en los casos de adopción, hemos sostenido que los requisitos sustantivos contenidos en el Código Civil en cuanto a la figura de la adopción son de carácter jurisdiccional, por lo cual el incumplimiento con uno de ellos priva de jurisdicción a los tribunales. Virella v. Proc. Esp. Rel. Fam., supra, pág. 756; Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201, 208 (1999); M.J.C.A., menor v. J.L.E.M., menor, 124 D.P.R. 910, 921 (1989).
Uno de los requisitos sustantivos de los procedimientos de adopción se encuentra codificado en el Art. 137 del Código Civil, 31 L.P.R.A. sec. 538, el cual establece, inter alia, que
[u]na vez decretada la adopción, el adoptado será conside- *859 rado para todos los efectos legales como hijo del adoptante con todos los derechos, deberes y obligaciones que le corresponden por ley. La adopción por decreto final y firme extinguirá todo vínculo jurídico entre el adoptado y su familia biológica o adoptiva anterior. (Enfasis suplido).
Esta disposición instituye en Puerto Rico lo que se co-noce en el Derecho de Familia como la adopción plena. Se-gún comenta el profesor Serrano Geyls, en este tipo de adopción “prevalece el principio romano adoptio naturam imitatur —la adopción imita a la naturaleza— ya que se establece jurídicamente el parentesco del adoptado no sólo con el adoptante sino con toda su familia”. Serrano Geyls, Derecho de familia, op. cit., pág. 1086.
No obstante, por la vía jurisprudencial establecimos una excepción a esa norma. En Ex parte J.A.A., 104 D.P.R. 551 (1976), una mujer soltera solicitó individualmente adoptar a una menor hija de un ex compañero sentimental. Resolvimos en ese caso que en circunstancias en las cuales una persona solicita la adopción de un menor individual-mente “el tribunal, en vista de las circunstancias específi-cas de cada caso, deberá decidir si la ruptura del paren-tesco biológico del adoptado opera respecto de ambas líneas, la paterna y la materna, o respecto de una sola”. Id., pág. 558. Sustentamos esa conclusión en que ninguna dis-posición legal vigente en ese momento impedía que un adoptado que adquiriese un padre adoptivo pudiera seguir vinculado con una de sus líneas de parentesco natural. Id.
La Asamblea Legislativa, a posteriori, codificó la excepción que reconocimos en Ex parte J.A.A., supra, al promulgar la Ley Núm. 8-1995 (31 L.P.R.A. sec. 531 et seq.). Mediante este estatuto, se enmendó el primer párrafo del Art. 138 del Código Civil, 31 L.P.R.A. sec. c539, para que leyese como sigue:
... los vínculos jurídicos del adoptado con su familia paterna o materna anterior subsistirán cuando el adoptado sea hijo del cónyuge del adoptante, aunque el padre o madre hubiere fa- *860 llecido a la fecha de presentación de la petición de adopción, o cuando el adoptado proviene de una única filiación y es adop-tado por persona de distinto sexo al del padre o madre que lo ha reconocido como su hijo. (Enfasis suplido).
En el caso de autos este artículo es cuestionado por la parte peticionaria. Esta desea adoptar a la hija de su com-pañera sentimental, la cual ha consentido a la adopción pero no desea romper los vínculos jurídicos con su hija. La menor JMAV proviene de una única filiación, por lo que, según lo dispuesto en el Art. 138, supra, esta no puede ser adoptada por la peticionaria ya que es del mismo sexo de la madre de la menor.
Para atacar esta disposición legal, la peticionaria nos presenta dos (2) argumentos. Primero, sostiene que el Art. 138, supra, padece de defectos constitucionales ya que ins-tituye un discrimen por sexo —el cual la peticionaria alega incluye discrimen por género y por orientación sexual— y un discrimen por nacimiento, lo cual está prohibido por la Sección 1, del Artículo II de la Constitución de Puerto Rico. Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 272. Además, la peticionaria alega que el artículo se-gún codificado representa una violación a su Derecho a la Intimidad según protegido por la Sección 8 del Artículo II de la Constitución y la jurisprudencia interpretativa de este Tribunal y del Tribunal Supremo de Estados Unidos.
Como señalamos, para “salvar la constitucionalidad” del Art. 138, supra, la peticionaria nos plantea un segundo argumento. Se trata de una invitación a que adoptemos jurisprudencialmente la figura conocida en jurisdicciones de derecho común como Second Parent Adoption. Es decir, nos peticiona que enmendemos jurisprudencialmente el Art. 138, supra, para permitir la adopción de la menor JMAV sin que esta se vea obligada a romper los vínculos jurídicos con su madre natural. Ello tendría el efecto de que a la menor JMAV se le reconocieran dos (2) madres legales.
*861 IV
Previo a analizar las controversias constitucionales pre-sentadas, debemos determinar si estas fueron correcta-mente planteadas por la peticionaria. Ello ante la determi-nación de los tribunales inferiores que concluyeron que la peticionaria no argumentó formalmente la inconstituciona-lidad del Art. 138, supra.
De un análisis de los autos podemos colegir que los tribunales inferiores erraron al determinar que la controver-sia constitucional no fue argumentada por la peticionaria desde el inicio del procedimiento de adopción. La peticio-naria presentó ante el Tribunal de Primera Instancia un documento titulado Memorando Final de Derecho en Apoyo a la Petición de Adopción el 19 de abril de 2007. En este, la peticionaria expone una profunda y fundamentada argumentación en cuanto a las razones por las cuales sos-tiene que el Art. 138 del Código Civil, supra, es inconstitucional.(7) Por ende, tanto el foro apelativo inter-medio como el Tribunal de Primera Instancia, Sala Superior de San Juan erraron al determinar que la peticionaria no argumentó formalmente desde las primeras etapas del caso la inconstitucionalidad del Art. 138, supra.
Ante ello, el rol de este Tribunal es el de interpretar las disposiciones de la Constitución y hacer valer sus postula-dos, puesto que “estamos llamados a delimitar los contor-nos de las cláusulas constitucionales enjuego. Recordemos que no nos es dable rehuir de nuestra responsabilidad como custodios de la Constitución”. Aponte Hernández v. AFI, 175 D.P.R. 256, 265-266 (2009) (Sentencia), opinión de conformidad de Rodríguezf Rodríguez, J. Asuntos tan importantes como el que presenta el caso de autos merecen nuestra total atención, “pues a los jueces no nos puede do-minar el temor a decidir”, Domínguez Castro et al. v. *862 E.L.A. I, 178 D.P.R. 1, 15-16 (2010), “aunque lo que deci-damos nunca antes se haya resuelto”. Trans-Oceanic Life Ins. v. Oracle Corp., 184 D.P.R. 689, 710 (2012).
V
Conforme hemos reseñado, la parte peticionaria cues-tiona la constitucionalidad del Art. 138 del Código Civil, supra. Sostiene que, ya que ese artículo permite que los vínculos jurídicos de un menor que ostente una única filia-ción subsistan solo en aquellos casos que sea adoptado por una persona de distinto sexo de su padre o madre, se vio-lenta su derecho a la igual protección de las leyes. Ello ya que la peticionaria alega que el artículo establece una cla-sificación por sexo, género y orientación sexual. A su vez, la peticionaria sostiene que el Art. 138, supra, establece un discrimen por nacimiento.
A. Igual protección de las leyes
El derecho a la igual protección de las leyes se encuentra consagrado en la Sección 7 del Artículo II de la Constitución de Puerto Rico. Específicamente, dispone esa cláusula que “[n]inguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes”. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 296.
La referida disposición constitucional ha sido objeto de interpretación por parte de este Tribunal en múltiples ocasiones. Hemos expresado que el principio de igual protección de las leyes “no exige que siempre se dé un trato igual a todos los ciudadanos sino que prohíbe un trato desigual e injustificado”. Domínguez Castro et al. v. E.L.A. I, supra, pág. 71.
Cuando se analiza una controversia en la cual se *863 acude al principio de igual protección de las leyes debemos tener presentes varios entendidos. Como expone el profe-sor Alvarez González:
... toda ley clasifica, en alguna medida. Aun las más abar-cadoras y aparentemente uniformes distinguen entre las per-sonas... [l]a aplicación judicial del principio de igualdad cons-titucional, por lo tanto, tiene que acometer esa tarea consciente de que las clasificaciones legislativas son tan nece-sarias como inevitables, por lo que debe haber razones de peso que identifiquen aquellas^ clasificaciones que trascienden el ámbito de lo permisible. (Énfasis en el original). Álvarez González, op. cit., págs. 825-826.
Conscientes de esa realidad, hemos establecido que “[a]nte la impugnación de una clasificación, la función judicial se limita a examinar la razonabilidad de ésta”. San Miguel Lorenzana v. E.L.A., 134 D.P.R. 405, 425 (1993). Véase Zachry International v. Tribunal Superior, 104 D.P.R. 267, 277 (1975). Por eso, hemos determinado que en las situaciones en las que se cuestione una clasificación legislativa al amparo de la Cláusula de Igual Protección de las Leyes, los tribunales deben utilizar uno de dos (2) tipos de escrutinios: el escrutinio tradicional o el escrutinio estricto. Domínguez Castro et al. v. E.L.A. I, supra, pág. 71; López v. E.L.A., supra, pág. 298.
Cuando los tribunales se enfrenten a una clasificación de índole social o económica, debe utilizarse el escrutinio de racionalidad mínima o escrutinio tradicional. Pérez, Román v. Proc. Esp. Rel. de Fam., supra, pág. 212. Conforme con este, la clasificación legislativa se presumirá constitucional, por lo cual compete a la parte que la cuestiona demostrar que la misma padece de defectos que la invalidan constitucionalmente. La clasificación sobrevivirá el escrutinio tradicional siempre y cuando se pueda determinar que persigue un interés estatal legítimo que tiene un nexo racional con la clasificación. López v. E.L.A., supra, pág. 298; Berberena v. Echegoyen, 128 D.P.R. 864, 879 *864 (1991). A esos efectos, en este nivel de escrutinio las clasi-ficaciones sobrevivirán siempre y cuando no sean arbitra-rias o irracionales. Domínguez Castro et al. v. E.L.A. I, supra, pág. 72.
Es por eso que hemos expresado que en este ni-vel de escrutinio, los tribunales
... tiene[n] que adoptar una actitud de gran deferencia hacia la actuación legislativa que se impugna. El fundamento de esta norma de deferencia reside en el principio constitucional de separación de poderes. Debido a que las Ramas Legislativa y Ejecutiva son las llamadas a establecer e implantar la polí-tica pública del Estado, el examen judicial no se puede conver-tir en una evaluación independiente de la sabiduría o correc-ción de la legislación o actuación impugnada... Aunque la clasificación no parezca ser la manera más acertada, ade-cuada, sabia y eficiente de adelantar el propósito legislativo, el tribunal debe mantener su constitucionalidad una vez se de-muestre que existe una relación racional entre ésta y el propó-sito esbozado. Por lo tanto, la intervención judicial será muy limitada. (Énfasis suplido). San Miguel Lorenzana v. E.L.A., supra, págs. 431-432.
A contrario sensu, la intervención judicial será más extensiva cuando se aplique el escrutinio estricto. Este nivel de escrutinio ha de ser utilizado por los tribuna-les en aquellas situaciones en que la legislatura haya creado una clasificación sospechosa o que incida en el ejer-cicio de un derecho fundamental. López v. E.L.A., supra, pág. 299. “Son clasificaciones sospechosas aquellas que se establecen por razón de raza, color, sexo, nacimiento, ori-gen o condición social, ideas políticas o religiosas y nacionalidad”. Pérez, Román v. Proc. Esp. Rel. de Fam., supra, págs. 212-213. Por su parte, hemos reconocido como derechos fundamentales el derecho a la vida, a la libertad de culto, a la libertad de expresión, al voto y el derecho a la intimidad. Domínguez Castro et al. v. E.L.A. I, supra, pág. 73.
La utilización del escrutinio estricto conlleva va-rias consecuencias. Primero, la clasificación revisada se *865 presumirá inconstitucional, por lo cual será el Estado el llamado a defenderla. Segundo, para sostener la clasifica-ción, el Estado tendrá que demostrar la existencia de un interés apremiante que la justifique. Finalmente, aun cuando se demuestre la existencia de un interés de carác-ter apremiante, el Estado debe demostrar que el medio uti-lizado para promoverlo es el menos oneroso. Domínguez Castro et al. v. E.L.A. I, supra, págs. 73-74; Pérez, Román v. Proc. Esp. Rel. de Fam., supra, pág. 213; Disidente Univ. de P.R. v. Depto. de Estado, 145 D.P.R. 689, 696 (1998).
Conforme con el crisol doctrinario anteriormente ex-puesto, pasemos a analizar los planteamientos que ante nos presenta la peticionaria.
B. Discrimen por sexo
Entre las clasificaciones sospechosas prohibidas en nuestro ordenamiento se encuentran aquellas llevadas a cabo por razón del sexo de las personas. Zachry International v. Tribunal Superior, supra, pág. 279. A diferencia de la jurisdicción federal,(8) la Constitución de Puerto Rico expresamente prohíbe este tipo de discrimen. Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 272. En su Informe a la Convención Constituyente, la Comisión de Carta de Derechos dejó claro que el propósito de esta disposición constitucional “es reconocer el advenimiento de la mujer a la plenitud del derecho y a la igualdad de oportunidades con el hombre”. (Enfasis suplido). 4 Diario de Se- *866 siones de la Convención Constituyente de Puerto Rico 2561 (2003). Ala misma conclusión llegó el Presidente de la Con-vención Constituyente, al comentar que esa cláusula “re-sultará en la erradicación completa de discrímenes jurídi-cos con respecto a la mujer”. (Traducción nuestra). A. Fernós Isern, Original Intent in the Constitution of Puerto Rico, 2da ed., San Juan, Ed. Lexis-Nexis, 2002, pág. 35.
Cónsono con ello, hemos establecido que las clasificaciones por razón de sexo conllevan la utilización de escrutinio estricto. Zachry International v. Tribunal Superior, supra, pág. 277; Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 733 (1980). Con ello se intenta evitar que en nuestro ordenamiento existan clasificaciones basadas en “premisas subjetivas erróneas, tradicionales y estereotipadas que emanan de una visión masculina que —consciente o inconscientemente— tiene su razón de ser en la concepción y caracterización de la mujer como ‘sexo débil’ ”. Zachry International v. Tribunal Superior, supra, pág. 282. Por ende, al amparo de la cláusula de igual protección de las leyes prohíbe las clasificaciones “a base de meras conjeturas, prejuicios arcaicos y nociones estereotipadas, con abstracción de las características verdaderas de los miembros de género femenino”. Com. de la Mujer v. Srio. de Justicia, supra, pág. 733. No debe quedar espacio para dudar que esa disposición constitucional representa una aspiración para derrumbar en Puerto Rico los cimientos de la institución del patriarcado, específicamente en cuanto a sus visiones retrógradas y arcaicas del rol de la mujer en la sociedad.(9)
*867 Como hemos adelantado, en el caso de autos la peticio-naria argumenta que el Art. 138 del Código Civil, supra, contiene una impermisible clasificación por sexo, porque solo permite que los adoptandos mantengan sus vínculos jurídicos con su filiación biológica cuando provengan de una única filiación y sean adoptados por persona de dis-tinto sexo al del padre o madre que lo adopte.
De una mera lectura del Art. 138, supra, se puede apreciar que este no contiene una clasificación discriminatoria por razón de sexo. Como hemos dicho en otras ocasiones, el hecho de que exista una distinción entre los sexos en un estatuto no lo hace, a priori, inconstitucional. Pueblo v. Rivera Morales, 133 D.P.R. 444, 448 (1993). Por ende, es erróneo el planteamiento de la peticionaria en cuanto a que “las leyes no deben incluir ninguna consideración referente al sexo de la persona”.(10)
El Art. 138, supra, no contiene una clasificación basada en nociones arcaicas o estereotipadas de uno de los sexos, con el efecto de que se le nieguen a uno beneficios o se les trate de manera distinta entre sí. Eso sería el discrimen por razón de sexo que prohíbe nuestra Constitución. El Art. 138, supra, garantiza a ambos —hombres y mujeres— los mismos derechos de adopción en casos en que se pretendan mantener vínculos jurídicos entre el adoptando y su familia biológica. En otras palabras, la prohibición que contiene el Art. 138, supra, se extiende por igual a hombres y mujeres.
Tal vez en reconocimiento de esta realidad, la peticiona-ria presenta una teoría novel en esta jurisdicción en cuanto al alcance del término “sexo” contenido en la Sección 1 del Artículo II de la Constitución de Puerto Rico, teoría que a su vez es adoptada en la Opinión disidente de la Juez Aso-ciada Señora Rodríguez Rodríguez. Aduciendo que su argu-mento es uno “polifacético”, la peticionaria argumenta que *868 el Art. 138, supra, representa un “discrimen por razón de sexo en la medida que su orientación sexual no conforma a los estereotipos que se le asignan a su género. Por lo que el discrimen por orientación sexual es una modalidad del dis-crimen por género”.(11)
El argumento de la peticionaria se centra en convertir en sinónimos los términos “sexo” y “género”. En el informe sobre el discrimen por razón de género en los tribunales presentado por la Comisión Judicial Especial para Investi-gar el Discrimen por Género en los Tribunales de Puerto Rico (en adelante, Informe a la Rama sobre Discrimen por Género) se definió “sexo” como “las características biológi-cas diferentes entre hombre y mujer”.(12) Por su parte, en cuanto al “género”, se dijo que, a la luz de la literatura existente para mediados de la década de los noventa, este concepto se refería a “la construcción histórico social que se ha hecho de las características que se consideran definito-rias de las mujeres y de los hombres y de los comportamien-tos esperados de unas y de otros en nuestra sociedad”.(13)
Con el devenir de los años, ha surgido una gran canti-dad de literatura en cuanto al significado de la palabra “género”, al punto en que se puede colegir un consenso en cuanto a que “género” y “sexo” no necesariamente son lo mismo. Véase R.J. Cook y S. Cusack, Gender Stereotyping: Transnational Legal Perspectives, Philadelphia, University of Pennsylvania Press, 2010, págs. 20-31. La peticionaria en el caso de autos argumenta que incluido en la cláusula que prohíbe el discrimen por sexo en Puerto Rico se en-cuentra el discrimen por razón de género. A su vez, la pe-ticionaria sostiene que el discrimen por orientación sexual es una forma de discrimen por género, por lo cual el discri- *869 men por orientación sexual está vedado constitucional-mente en Puerto Rico.
No nos parecen meritorios los argumentos de la peticionaria. De entrada, este Tribunal nunca ha resuelto que el discrimen por orientación sexual es una modalidad del discrimen por sexo. Debe quedar claro que el Informe a la Rama Judicial sobre Discrimen por Género que concluyó que el discrimen por orientación sexual es una modalidad del discrimen por género no se basó en la cláusula constitucional que prohíbe el discrimen por sexo. No es posible llegar a una conclusión que no sea que la referida cláusula constitucional se limita a prohibir discrímenes basados en nociones arcaicas del rol de la mujer en la sociedad.(14)
La prohibición del discrimen por sexo que contiene nuestra Constitución no se extiende a otras formas de discrimen. El historial de la Convención Constituyente, así como los precedentes de este Tribunal a través de varias décadas, dejan claro el ámbito de extensión de la referida cláusula. No es un ejercicio intelectual honesto el pretender que la cláusula que prohíbe el discrimen por sexo, con todo su historial claro y su propósito de erradicar las nociones arcaicas del rol de la mujer en nuestra sociedad, sea el vehículo que cargue por osmosis con el discrimen por orientación sexual. La historia sencillamente nos demuestra que el propósito de esa cláusula es otro.
A esta conclusión han llegado otros tribunales que se han enfrentado a ese argumento. Véase, por ejemplo, Hernández v. Robles, 855 N.E.2d 1, 10-11 (N.Y. 2006). Incluso miembros de la academia han cuestionado la utilización de la cláusula de discrimen por sexo como vehículo para desarrollar protecciones constitucionales para perso- *870 ñas homosexuales. Véase E. Stein, Evaluating the Sex Discrimination Argument for Lesbian and Gay Rights, 49 U.C.L.A. L. Rev. 471 (2001). La existencia de un rechazo social hacia las personas homosexuales no se debe a nocio-nes patriarcales en cuanto al rol de la mujer, sino a visio-nes históricas y culturales que han engendrado, quizás in-justificadamente, un ambiente de discrimen por orientación sexual en algunos sectores de la sociedad. No obstante, y como hemos visto, la cláusula que prohíbe el discrimen por sexo no fue diseñada para evitar ese discri-men, sino para intentar ponerle un freno a visiones este-reotipadas del rol de la mujer en la sociedad puerto-rriqueña.
En su disenso, la Juez Asociada Señora Rodríguez Ro-dríguez intenta combatir todo el registro histórico con una metodología adjudicativa que, si se lee entrelineas deteni-damente, resulta perturbadora. En ese disenso se dice sin ambages que el significado de la palabra “sexo” en la Cons-titución ha cambiado con el paso del tiempo. Nótese que no argumenta que la interpretación de ese vocablo que ha rea-lizado este Tribunal en casos pasados ha sido errada, sino que literalmente expone que el significado del texto consti-tucional ha cambiado con el tiempo. ¿Cuál es el talismán que utiliza la Juez Asociada para descifrar ese cambio? Ninguno otro que su noción personal de lo que ella consi-dera debe ser el significado de la Constitución de Puerto Rico en el 2013.
Ciertamente, en su disenso la compañera Juez se vale de un popurrí de argumentos jurídicos para intentar esconder lo que verdaderamente está argumentando. Refugiándose en el texto de diversas cláusulas del Art. II de la Constitución, el disenso argumenta que los propios constituyentes le proveyeron las herramientas a este Tribunal para que determinara que el significado de las cláusulas constitucionales puede cambiar con el tiempo. Aun si asumiéramos arguendo que eso es cierto, la Juez Asociada *871 Señora Rodríguez Rodríguez olvida un principio constitu-cional básico: que los tribunales no somos los únicos que interpretamos la Constitución de Puerto Rico. Como elo-cuentemente ha explicado el profesor Alvarez González:
La interpretación constitucional no es función exclusiva de la rama judicial. Antes bien, las ramas políticas, si bien usual-mente de forma implícita, realizan esa función con mayor fre-cuencia que la rama judicial. Los funcionarios de las ramas políticas, al igual que los jueces, han jurado fidelidad a la Constitución. (Enfasis suplido). Álvarez González, op. cit., págs. 22-23.
Esto significa que el hecho de que la Rama Judicial tenga la última palabra en cuanto a la interpretación cons-titucional no se traduce a que las otras ramas no puedan interpretar la Constitución al ejercer sus funciones. Por eso, según la Doctrina de Separación de Poderes, compete a las ramas políticas proponer cambios al texto constitucio-nal para atemperar el documento al paso del tiempo. P.I.P. v. E.L.A. et al., supra. Después de todo, son esas ramas las más cercanas al Pueblo y las que en mejor posición están para determinar si la Constitución requiere cambios. No es que nuestra Carta Magna sea “prisionera del tiempo” como alegan los disensos, sino que la llave para dar paso a un cambio en el significado de su texto no está en posesión de los Jueces del Tribunal Supremo.
Siendo esto así, es impresionante que desde este Foro varios de sus miembros abiertamente esbocen una teoría de interpretación que permita a los jueces determinar que el significado de la Constitución ha sufrido una metamor-fosis a través del tiempo. ¿Qué legitimidad tienen los nueve (9) abogados que tienen el privilegio de ostentar las togas de este honroso Foro para anunciar al Pueblo de Puerto Rico que el significado de su lex superior se ha al-terado? Una cosa es decir que tenemos el poder para inter-pretar el documento constitucional, pero algo completa-mente distinto es conjurar un alegado poder para cambiar el significado de su texto. Ello es ajeno al concepto de re- *872 visión judicial en nuestro sistema político. Ese poder que reclama ostentar la disidencia es peligroso y rehusamos avalarlo. Somos jueces, no filósofos-reyes socráticos.
Sencillamente no podemos dar una interpretación de la cláusula constitucional que prohíbe el discrimen por sexo que va más allá de su significado original y que pretende ignorar la historia detrás de la cláusula que prohíbe el dis-crimen contra las mujeres. Los sectores que entiendan que la Constitución de Puerto Rico debe contener disposiciones para atender la médula del asunto presentado por la peti-cionaria tienen como herramienta el proceso legislativo en aras de encaminar una posible enmienda constitucional. Lo que no tienen disponible es aferrarse a otra cláusula constitucional, de linaje totalmente distinto, para encausar sus planteamientos.
Por todo lo antes discutido, no tiene razón la peticiona-ria en su argumento de que el Art. 138 del Código Civil, supra, contiene una clasificación sospechosa por razón de sexo.
C. Discrimen por nacimiento
Como segundo argumento de índole constitucional, la peticionaria sostiene que la prohibición contenida en el Art. 138, supra, representa un discrimen por nacimiento, el cual está prohibido por la Sección 1 del Artículo II de la Constitución de Puerto Rico, supra. No le asiste la razón. Un somero análisis de la cláusula constitucional aludida nos obliga a llegar a ese resultado.
En el Informe de la Comisión de Carta de Derechos de la Asamblea Constituyente se estipuló que el término “nacimiento” contenido en la Constitución tenía el propósito de “eliminar el estigma jurídico en contra de los hijos habidos fuera de matrimonio. Se coloca a todos los hijos respecto de sus padres y respecto del orden jurídico en igualdad de derechos”. (Enfasis suplido). 4 Diario de Sesiones, supra, pág. 2562.
*873 Esta prohibición constitucional no tiene analogía en ninguna cláusula de la Constitución federal y tuvo el efecto de hacer inoperante en Puerto Rico “toda ley o parte de ley que en una u otra forma establecía o pudiera establecer clases o categorías de hijos por las circunstancias de su nacimiento”. (Enfasis suplido). Ocasio v. Díaz, 88 D.P.R. 676, 728 (1963). No debe quedar duda de que el propósito de esta cláusula es eliminar las distinciones entre hijos “legítimos” e “ilegítimos”.
No obstante esa realidad, la peticionaria sostiene que negarle a la menor del caso de autos “la posibilidad de obtener una segunda filiación a base de las circunstancias en las cuales nació, de las cuales la menor no tiene ningún control, constituye un discrimen en su contra”.(15) Este ar-gumento choca irremediablemente con el historial de la cláusula en contra del discrimen por nacimiento.
El argumento que sostiene la peticionaria fue esbozado por jueces disidentes de este Tribunal en el caso de Pérez, Román v. Proc. Esp. Reí. de Fam., supra. Así, por ejemplo, el Juez Asociado Señor Negrón García sostuvo que la adop-ción debe considerarse como un segundo nacimiento, razón por la cual el adoptado adviene a todos los derechos que tienen todos los otros nacidos en Puerto Rico. Íd., págs. 224-225.
Esta novel reinterpretación del historial de la cláusula que prohíbe el discrimen por nacimiento fue criticada se-veramente por distinguidos constitucionalistas. Véanse: Alvarez González, op. cit., págs. 760, 888-889; Serrano Geyls, Derecho de familia, op. cit., págs. 1144-1145. Re-sulta conveniente citar in extenso del análisis del profesor Serrano Geyls en cuanto a esta teoría:
[M]e parece equivocada la idea... de resolver los problemas constitucionales de los hijos adoptivos mediante la cláusula que prohíbe el “discrimen por nacimiento”... Esa cláusula *874 tiene como único efecto eliminar los discrímenes contra los antes llamados hijos “naturales” o “ilegítimos” y, por tanto, establecer la equiparación constitucional de esos hijos con los antes llamados “hijos legítimos”. No he hallado nada, absolu-tamente nada, en el largo historial de nuestras leyes y normas constitucionales que sostenga que ese mandato constitucional incluye a los hijos adoptivos... No debe equipararse constitu-cionalmente la filiación natural surgida de una relación bioló-gica —hoy científicamente comprobable— con una filiación artificial... No hay problema alguno de “nacimiento” en la filiación adoptiva, y por tanto, no debe utilizarse la figura constitucional del “discrimen por nacimiento” para medir la validez de requisitos jurisdiccionales de las leyes de adopción. Recuérdese que la Constitución no habla de “discrimen por filiación”. (Cita omitida y énfasis suplido). Íd.
Nos parece acertado este análisis. Sencillamente, las diferencias entre la adopción y el nacimiento son tan obvias que no merecen mayor discusión. Nuevamente, no debe-mos avalar interpretaciones de cláusulas constitucionales que claramente van en contra del propósito de quienes las formularon.
Por ser esto así, el Art. 138, supra, no contiene discri-men alguno por razón de nacimiento, por lo cual carece de méritos el planteamiento de la peticionaria.
D. A la luz de lo anterior, es forzoso concluir que el Art. 138, supra, no contiene clasificaciones sospechosas que ac-tiven la utilización del escrutinio estricto. Ergo, y de acuerdo con nuestros precedentes, debemos analizar la va-lidez de la disposición estatutaria según un escrutinio de racionalidad mínima. Como ya hemos discutido, para so-brevivir este nivel de análisis constitucional la clasifica-ción contenida en el Art. 138, supra, deberá responder a un interés estatal legítimo. A su vez, debe existir un nexo ra-cional entre la clasificación y ese interés.(16)
*875 El Gobierno de Puerto Rico aduce que el interés legítimo que deseaba proteger la Asamblea Legislativa a través del Art. 138 del Código Civil, supra, era “proteger los valores arraigados en la institución de la familia como pilar fundamental de nuestra sociedad e impregnarle... la más alta jerarquía al interés social que promueve el mejor bienestar del menor”.(17) Podemos confirmar este interés al dar una lectura a la Exposición de Motivos de la Ley Núm. 8-1995, (Parte 1) Leyes de Puerto Rico, pág. 47, la cual establece, inter alia, que
[l]os niños de Puerto Rico merecen tener la oportunidad de que sus vidas se desarrollen al calor de un hogar, sintiendo el amor de irnos padres. La institución de la familia es el pilar principal de nuestra sociedad, por lo tanto hay que brindarle a esos niños la oportunidad de formar parte de un seno familiar.
La Asamblea Legislativa entendió que es a través de lo que se conoce como la familia tradicional —padre, madre e hijos— en donde se pueden sostener de manera más ade-cuada la estabilidad necesaria para proteger efectivamente el mejor bienestar de los menores en Puerto Rico. Ello se refiere a aquellos casos de adopción en que legalmente se le reconocerán dos (2) padres legales al menor. No evalua-mos la sabiduría de ese requisito: nuestra función consti-tucional se limita a analizar su validez. Al respecto, con-cluimos que ese juicio legislativo es legítimo, y la clasificación contenida en el Art. 138, supra, guarda un nexo racional con este. Puesto que hemos apuntado que según el escrutinio de racionalidad mínima, “[a]unque la clasificación no parezca ser la manera más acertada, ade- *876 cuada, sabia y eficiente de adelantar el propósito legislati-vo”, Domínguez Castro et al. v. E.L.A. I, supra, pág. 72, debemos sostener la constitucionalidad de los estatutos una vez encontremos un nexo racional entre el interés le-gítimo del Estado y la clasificación impugnada.(18)
No albergamos dudas en cuanto a que el Art. 138, supra, no padece de defectos constitucionales. La Asamblea Legis-lativa emitió un juicio de política pública a través de este estatuto y entendió que la familia tradicional es el am-biente más estable para desarrollar a los menores en Puerto Rico cuando se les reconozcan legalmente dos (2) padres.(19) Ese juicio no es irrazonable ni arbitrario. Según la Doctrina de Separación de Poderes que ya fue objeto de discusión, no nos compete como jueces cuestionar ese juicio legislativo una vez concluyamos que no está basado en una clasificación sospechosa ni incide en derecho fundamental alguno. La pregunta ante nosotros no es si la clasificación es la más sabia o la que mejor se adapta a nuestra visión individual de lo que es una familia ideal. Tampoco pode-mos resolver si el juicio legislativo plasmado en el estatuto es acorde con las preferencias generales o mayoritarias de la población de Puerto Rico. La revisión se limita sola-mente a verificar si el fin es legítimo y el nexo de la clasi-ficación con ese fin es racional. En este caso, se cumple con ese estándar.
*877 La realidad es que aunque aceptemos la existencia de otros modelos de organización familiar, ello no significa que la Asamblea Legislativa, el ente que formula por de-creto constitucional la política pública de Puerto Rico, no puede preferir el modelo de la familia tradicional por en-cima de otros modelos. Ese juicio es eminentemente legis-lativo y no nos compete como juristas aprobar o desaprobar los diferentes tipos de modelos familiares que se vayan de-sarrollando en la sociedad. El reconocimiento legal de esos modelos familiares no se puede dar en los pasillos del Tribunal Supremo, sino en el hemiciclo de los Cuerpos Legislativos.
Cónsono con lo anterior, el Art. 138, supra, persigue un interés legítimo y existe un nexo racional entre este y la clasificación establecida. Por ende, la referida disposición sobrevive el ataque constitucional según la Cláusula de Igual Protección de las Leyes.
VI
A. Derecho a la intimidad
Como último ataque constitucional al Art. 138 del Có-digo Civil, supra, la peticionaria sostiene que este incide de manera impermisible con su Derecho a la Intimidad. Sus-tenta este argumento, escuetamente, en que nuestra Cons-titución y una decisión del Tribunal Supremo de Estados Unidos garantizan el derecho a “tener hijos, criarlos y edu-carlos, la planificación familiar, la procreación, el aborto, el matrimonio, el divorcio y las relaciones íntimas con parejas del mismo sexo”.(20)
No nos parecen convincentes los argumentos de la peti-cionaria ya que entendemos, a priori, que su interpretación del Derecho a la Intimidad en Puerto Rico y, en particular, de la jurisprudencia del Tribunal Supremo de Estados Uni- *878 dos, se sustenta en una lectura demasiado extensiva de estas.
La Sección 1 del Artículo II de la Constitución de Puerto Rico consagra que la “dignidad del ser humano es inviolable”. Art. II, Sec. 1, Const. E.L.A., supra. Por su parte, la Sección 8 del Artículo II establece que “[t]oda persona tiene derecho a protección contra ataques abusivos a su honra, a su reputación y a su vida privada y familiar”. Art. II, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 317. Es en esas dos (2) disposiciones que queda constitucionalmente protegido el Derecho a la Intimidad en Puerto Rico. Pérez, Román v. Proc. Esp. Rel. de Fam., supra, pág. 218.
No hay duda de que ese derecho “es uno de la más alta jerarquía en nuestro ordenamiento jurídico”. Vega et al. v. Telefónica, 156 D.P.R. 584, 602 (2002). Véanse, además: Pérez, Román v. Proc. Esp. Rel. de Fam., supra, pág. 218; Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35, 59 (1986). La necesidad de este derecho para nuestra organización política recae en el interés estatal de adelantar una adecuada paz social y colectiva. López v. E.L.A., supra, pág. 294. A su vez, la primacía de este derecho es tan eminente que hemos establecido que opera ex proprio vigore, sin la necesidad de una acción estatal para poder invocarse frente a personas particulares, hozada Tirado et al. v. Testigos Jehová, 177 D.P.R. 893, 910 (2010).
Entre sus múltiples vertientes, el Derecho a la Intimidad protege a las personas en la toma de decisiones personales, familiares e íntimas. Lozada Tirado et al. v. Testigos Jehová, supra, págs. 910-911; López v. E.L.A., supra, pág. 295; Pueblo v. Duarte Mendoza, 109 D.P.R. 596 (1980). No obstante, reiteradamente hemos resuelto que, al igual que otros derechos, el Derecho a la Intimidad no es absoluto, por lo cual su primacía constitucional no se traduce a que el estado nunca puede interferir en la vida pri- *879 vada de los ciudadanos. López Tristani v. Maldonado, 168 D.P.R. 838, 851-852 (2006); López v. E.L.A., supra, pág. 296. Es decir, la invocación del derecho a la intimidad no es un amuleto jurídico que vence “a todo otro valor en con-flicto bajo todo supuesto concebible”. E.L.A. v. P.R. Tel. Co., 114 D.P.R. 394, 401 (1983).
Como hemos discutido, la peticionaria sostiene que la prohibición de adopción por parejas del mismo sexo conte-nida en el Art. 138 del Código Civil, supra, incide en su Derecho a la Intimidad. Este planteamiento carece de méritos. Primero, el Estado en el caso de autos no se ha inmiscuido irrazonablemente en la vida íntima de la peticionaria. Esta mantiene una relación sentimental con su pareja y el Estado nunca la ha criminalizado por ello, ni la ha privado de ejercer derecho alguno en su intimidad. Segundo, la peticionaria comparte con su pareja las deci-siones sobre la crianza, educación y sostenimiento de la menor JMAV, la cual considera su hija, sin que el Estado se haya inmiscuido en ese proceso en momento alguno. Ter-cero, en su esencia la decisión de adoptar a un menor de edad no es una decisión privada sino una intrínsecamente pública. Ello ante los eminentes intereses estatales en cui-dar por el mejor bienestar de los menores. Al comparecer a un tribunal para comenzar un procedimiento de adopción fue la propia peticionaria la que abrió las puertas de su hogar al foco público. Por definición, el reclamo de que se haga un reconocimiento público de una filiación no es un reclamo privado.
En su fondo, lo que la peticionaria argumenta es que su Derecho a la Intimidad la hace acreedora para tomar cual-quier decisión en cuanto a asuntos personales, familiares o íntimos. Cabe preguntarse si según ese argumento sobre-vive alguno de los requisitos jurisdiccionales establecidos en el Código Civil para procedimientos de adopción.(21)
*880 Ante ello, concluimos que el Art. 138, supra, no incide de manera inconstitucional con el Derecho a la Intimidad de la peticionaria. Es evidente que el Estado no se ha inmis-cuido de forma inadmisible en la manera en que esta y su pareja viven su vida. Prueba de ello es que la menor JMAV continúa viviendo bajo su techo y la está criando como su hija, sin que el Estado se lo prohíba. El Estado tampoco ha criminalizado su relación sentimental, pero este no tiene una obligación constitucional de investir a esa relación con los mismos derechos que tienen otras relaciones en cuanto a los procedimientos de adopción.
B. Finalmente, la peticionaria y algunas de la partes que intervienen como amicus curiae sostienen que el Art. 138 del Código Civil, supra, debe ser declarado inconstitu-cional según la doctrina establecida por el Tribunal Supremo de Estados Unidos en los casos de Romer v. Evans, 517 U.S. 620 (1996), y Lawrence v. Texas, 539 U.S. 558 (2003). No les asiste la razón. Aunque el significado de lo establecido por el más alto foro federal en esos casos con-tinúa generando debate, consideramos que la peticionaria sostiene una interpretación demasiado extensiva de esos precedentes.(22)
En el primero de estos casos, Romer v. Evans, supra, el Tribunal Supremo de Estados Unidos declaró inconstitu-cional una enmienda aprobada por el electorado a la Cons-titución del estado de Colorado. Esa enmienda le prohibía a cualquier jurisdicción dentro del estado poner en vigor cualquier legislación dirigida a dar protección a grupos *881 homosexuales. El más alto foro federal aplicó un escrutinio racional a esa disposición y encontró que no podía soste-nerse ya que no perseguía un fin estatal legítimo. De he-cho, el Tribunal razonó que la enmienda constitucional no perseguía ningún fin que no fuera el crear una clasificación “for its own sake”, lo cual la Cláusula de Igual Protección de las Leyes de la Constitución prohíbe.
Ocho (8) años más tarde en Lawrence v. Texas, supra, el Tribunal Supremo de Estados Unidos reconoció que en el ámbito de libertad garantizado por la Cláusula de Igual Protección de las Leyes de la Decimocuarta Enmienda de la Constitución federal, las personas homosexuales tienen derecho a incurrir en lo que denominó “conducta homosexual” sin la intervención del Estado. A esos efectos, el Tribunal sostuvo que una ley que criminalizaba la sodomía entre personas del mismo sexo no perseguía un fin estatal legítimo que justificara una intromisión en la vida privada de las personas, por lo cual no podía sostenerse al amparo de la Constitución federal. íd., pág. 578.
No obstante, el Tribunal delimitó de forma clara el ám-bito de extensión del principio constitucional enunciado en Lawrence v. Texas:
The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. (Enfasis suplido). Lawrence v. Texas, supra, pág. 578.
Esta decisión ha generado una amplia discusión acadé- *882 mica, así como varios pleitos de índole constitucional para poner a prueba los límites de lo expresado por el Tribunal. Véase W. Rubenstein y otros, Cases and Materials on Sexual Orientation and the Law, 3ra ed., St. Paul, Ed. Thomson/West, 2008, págs. 203-245. A esos efectos, diver-sos tribunales han concluido, correctamente en nuestra apreciación, que el Tribunal Supremo de Estados Unidos no reconoció la existencia de un derecho fundamental en Romer v. Evans, supra, ni en Lawrence v. Texas, supra. Véanse: Massachusetts v. U.S. Dept. of Health and Human Services, 683 F.3d 1 (1er Cir. 2012); Perry v. Brown, 671 F.3d 1052 (9no Cir. 2012); Muth v. Frank, 412 F.3d 808, 818 (7mo Cir. 2005); Lofton v. Secretary of Dept. of Children and Family Servs., 358 F.3d 804, 815-816 (11mo Cir. 2004); Williams v. Attorney General of Ala., 378 F.3d 1232, 1236 (11mo Cir. 2004).
En su sustrato, en Romer v. Evans, supra, y Lawrence v. Texas, supra, se utilizó un escrutinio racional para anali-zar la validez de leyes que afectaban a personas homosexuales. Según ese escrutinio, se concluyó que no existía un interés estatal legítimo para penalizar criminal-mente a las personas homosexuales que incurran en cierto tipo de conducta como en el caso de Texas, o para despojar-los de todo tipo de derechos como en el caso de Colorado. Ese es el principio constitucional enunciado en esos casos.
Por ende, no podemos aceptar la invitación de la peticio-naria y varios amicus curiae, a darle una lectura a estos precedentes más extensiva de lo que en Derecho requieren. El Art. 138, supra, no incide de manera alguna en la deci-sión de la peticionaria de incurrir en la conducta sexual que desee. Ninguna actuación íntima de ella y su pareja ha sido criminalizada o prohibida por el Estado.
Por ser esto así, y ante la conclusión de que el Art. 138 del Código Civil, supra, persigue un interés estatal legí-timo, este no incide de manera inconstitucional con el de-recho a la intimidad de la peticionaria ni con sus intereses *883 libertarios de acuerdo con Romer v. Evans, supra, y Lawrence v. Texas, supra.
VII
Resta por evaluar el argumento alternativo que pre-sentó la peticionaria en los tribunales inferiores. Como se-ñalamos anteriormente, la peticionaria sostuvo que debía adoptarse en Puerto Rico la figura del Second Parent Adoption, o adopción por padre o madre funcional, para “salvar la constitucionalidad” del Art. 138 del Código Civil, supra.
La figura de Second Parent Adoption “permite a alguien adoptar a un menor que tiene otro padre biológico o legal, sin requerirle a este último dar por terminado sus derechos filiales”. (Traducción nuestra). K. Moulding, Sexual Orientation and The Law, Ed. Thomson Reuters/ West, 2012, Vol. I, pág. 208. Es decir, esta figura “mantiene intactos los derechos de uno de los padres legales y reconoce un segundo padre legal para el menor”. (Traducción nuestra). Rubenstein y otros, op. cit., pág. 778.(23)
En el caso de parejas homosexuales, esta figura re-quiere un grado de interpretación por parte de los tribuna-les para determinar si es compatible con los requisitos sus-tantivos de la adopción. Diversos tribunales en Estados Unidos han tenido la oportunidad de llevar a cabo ese ejer-cicio interpretativo. Por ejemplo, en In re Adoption of Luke, 640 N.W2d 374 (2002), el Tribunal Supremo de Nebraska denegó una adopción de un menor en un caso similar al de autos. El Tribunal interpretó que el estatuto de adopción de Nebraska requería que se dieran por terminados los vínculos jurídicos de la madre biológica con el menor. Ante *884 ello, la figura del Second Parent Adoption no podía apli-carse por contravenir ese requisito. Íd., pág. 383. A esa misma conclusión han llegado tribunales en los estados de Ohio y Wisconsin. Véanse: In re Adoption of Doe, 719 N.E.2d 1071 (1998); In Interest of Angel Lace M., 516 N.W.2d 678 (1994).(24) El Tribunal Supremo de Connecticut llegó a la misma conclusión, lo cual llevó a que, conforme a la Doctrina de Separación de Poderes, la Asamblea Legis-lativa de ese estado enmendara su estatuto de adopción para dar paso a la figura de Second Parent Adoption. Véase In re Adoption of Baby Z, 724 A.2d 1035 (1999).
La peticionaria nos coloca en posición de llevar a cabo un ejercicio de interpretación del Art. 138 del Código Civil, supra, para determinar si este permite la figura del Second Parent Adoption en Puerto Rico. Como hemos ex-presado en reiteradas ocasiones, al interpretar un estatuto debemos acudir primero al texto de la ley. Cruz Parrilla v. Depto. Vivienda, 184 D.P.R. 393, 404 (2012). Subsiguientemente, “solo si se encuentra ambigüedad en el texto, deben entonces los tribunales asegurarse de cumplir con los propósitos legislativos”. Íd.
Es menester recordar que en nuestro ordenamiento si el lenguaje de la ley es claro y libre de toda ambigüedad, “la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu”. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Por esa razón, hemos establecido que “si el len-guaje de la ley no crea dudas y es claro en cuanto a su propósito, su propio texto es la mejor expresión de la inten-ción legislativa”. Soc. Asist. Leg. v. Ciencias Forenses, 179 D.P.R. 849, 862 (2010).
*885 Una mera lectura de los Arts. 137 y 138 del Código Civil de Puerto Rico demuestran la imposibilidad de adoptar por interpretación judicial la figura del Second Parent Adoption en nuestra jurisdicción. Como hemos mencionado, el Art. 137, supra, requiere la extinción de los vínculos entre el padre biológico y el adoptando. A su vez, el Art. 138, supra, en casos de menores que provengan de una única filiación, impide que una persona del mismo sexo del padre del menor lo adopte. Estos requisitos, cuya constitucionalidad ya sostuvimos, nos impiden dar paso a la figura del Second Parent Adoption en Puerto Rico y, por ende, permitir la adopción en el caso de autos.
Las disposiciones contenidas en los Arts. 137 y 138 del Código Civil, supra, no son meras directrices que los jueces podemos obviar cuando nos puedan resultar antipáticas. Se trata de requisitos cuyo incumplimiento anula el poder que ostenta un tribunal para otorgar solicitudes de adopción. Estos requisitos estatutarios no surgieron de un vacío, sino de un sosegado y cuidadoso juicio del ente que en nuestro ordenamiento está encomendado a establecer la política pública: la Rama Legislativa.
Por otro lado, no cabe duda de que el mejor bienestar del menor es el principio rector que guía todo el procedimiento de adopción. Sin embargo, los tribunales deben considerar ese principio sin dejar de observar los requisitos jurisdiccionales y sustantivos que la Asamblea Legislativa estableció en el Código Civil. El principio del mejor bienestar del menor está atado inexorablemente a los requisitos procesales de la adopción. Véase Virella v. Proc. Esp. Rel. Fam., supra, pág. 759. Valga señalar que el elemento significativo del mejor bienestar del menor no concede discreción a los tribunales para obviar las disposiciones que la Asamblea Legislativa adoptó legítimamente, como proponen todos los disensos que hoy se emiten. Ello equivale a decir que la Asamblea Legislativa propuso otorgarle discreción a los jueces para que resolvieran casos de adopción *886 de manera contraria a otras disposiciones estatutarias con-tenidas en los artículos del Código Civil. Es improcedente imputarle esa intención irracional a la Asamblea Legislativa. La facultad discrecional de los tribunales no se extiende a que decidan cuáles requisitos estatutarios son más apropiados que otros.
Finalmente, conceder la adopción solicitada en el caso de autos iría en contra del ratio decidendi utilizado por este Tribunal en Delgado, Ex parte, supra. En aquella oca-sión, por voz de la Juez Asociada Señora Rodríguez Rodrí-guez, concluimos que, puesto que la Ley del Registro De-mográfico establecía a modo de numerus clausus las instancias para realizar cambios en las anotaciones de cambios vitales de las personas en su Certificado de Naci-miento, no podíamos enmendar jurisprudencialmente el estatuto para permitir a un transexual cambiar su sexo en su certificado. Íd., págs. 191-192. No obstante, en el caso de autos el mismo estatuto que interpretamos en Delgado, Ex parte, supra, incluye una lista taxativa de los requisitos que se exigen al momento de inscribir a un recién nacido o a un menor adoptado. Estos requisitos incluyen la informa-ción del padre y de la madre del menor. Véase 24 L.P.R.A. sec. 1133. Por ende, si se permite la adopción en el caso de autos, se tendría que inscribir a la menor JMAV en el Re-gistro Demográfico con dos (2) madres, situación que no admite la Ley del Registro Demográfico. De permitir ello, enviaríamos al olvido nuestras expresiones en cuanto a que “le corresponde a la Asamblea Legislativa sopesar to-dos los intereses involucrados en la controversia que tras-luce el tema” de la homosexualidad para proponer respues-tas a un caso como el de autos. Delgado, Ex parte, supra, pág. 193.
Por todo lo anterior, y ateniéndonos al texto claro de la ley, no procede la incorporación de la figura de Second Parent Adoption al ordenamiento jurídico de Puerto Rico.
*887 VIII
Todo lo antes discutido nos obliga a denegar la adopción solicitada en el caso de autos. Como adelantamos, en su fondo este caso trasciende lo solicitado por la peticionaria y trata sobre quién tiene el poder para gobernar en nuestro ordenamiento constitucional. Sería una violación a los principios más básicos de la Doctrina de Separación de Po-deres el que los Jueces de este Tribunal reclamen que ese poder es suyo.
A su vez, hoy somos consistentes con nuestras expresiones pasadas en cuanto a que le “[c]orresponde a la Asamblea Legislativa y los legisladores electos que allí sirven determinar cuál deba ser la política pública que encarnen nuestras leyes”. Delgado, Ex parte, supra, pág. 192, opinión de Rodríguez Rodríguez, J. Son las leyes, en última instancia, “el reflejo de la voluntad del pueblo expresada democráticamente a través de los legisladores electos y recogen aquello que el pueblo está dispuesto a aceptar en un momento dado”. Íd., pág. 193. Pero más importante aún, “[e]l juzgador no debe sustituir su sentido de justicia por la letra clara del estatuto”. Id. Los disensos que se emiten hoy hacen exactamente lo contrario: sustituyen la letra de la ley y los postulados de derecho constitucional por su visión personal.
Ese proceder sería suficiente para dejar en pedazos la conclusión de Alexander Hamilton en cuanto a que la Rama Judicial es la menos peligrosa de las tres (3) ramas políticas. Nos rehusamos a usurpar inconstitucionalmente los poderes de la Rama Legislativa en aras de llegar a una conclusión simpática para algunos sectores. Como recien-temente expresó el Juez Presidente del Tribunal Supremo federal John G. Roberts:
Los miembros de este Tribunal ostentan la autoridad para in-terpretar la Ley; no poseemos ni el “expertise” ni la prerroga- *888 tiva para hacer juicios de política pública. Esas decisiones se han dejado en manos de los líderes electos de nuestra Nación, los cuales pueden ser removidos de sus puestos si el Pueblo está en desacuerdo con ellos. No es nuestro deber proteger al Pueblo de las consecuencias de sus decisiones políticas. (Tra-ducción y énfasis nuestros). National Federation of Ind. Business v. Sebelius, 132 S.Ct. 2566, 2579 (2012).(25)
Este caso confirma los límites del Poder Judicial. Hoy somos conscientes de esas fronteras invisibles pero podero-sas que delimitan el ámbito de acción de cada Rama del gobierno. Así, fortalecemos una de las promesas de nuestro documento constitucional: que el Poder emana del Pueblo y se ejerce de acuerdo con su voluntad. Se confirma de esta manera que esa voluntad no la determinan los nueve (9) Jueces de este Tribunal y se abona al desarrollo democrá-tico de un Pueblo, manteniendo el poder de establecer po-lítica pública en manos de las personas que le responden directamente al Pueblo. Ese es el resultado que se anuncia hoy en esta opinión: que la Rama Judicial no gobierna en nuestro ordenamiento.
Obviamente, lo que hoy resolvemos no elimina la reali-dad social de la peticionaria de autos. Sin embargo, como jueces estamos obligados a aplicar estrictamente el texto de las leyes. Por ello, y en reconocimiento del rol constitu-cional que se nos ha encomendado, estamos obligados a reconocer que lo solicitado por la señora A.A.R. no puede ser concedido por el Poder Judicial: el ordenamiento cons-titucional que como Pueblo hemos adoptado nos impide usurpar los poderes que se le han concedido a otra Rama del gobierno. No podemos olvidar que esos poderes le perte-necen al Pueblo y no a los nueve (9) Jueces que en un mo-mento dado ocupan sillas en este Tribunal. Por ende, es a *889 la Asamblea Legislativa donde la peticionaria, a partir de hoy, debe dirigir sus esfuerzos.
IX
Por todo lo antes discutido, se confirma la determina-ción del Tribunal de Apelaciones, que a su vez confirmó la determinación del Tribunal de Primera Instancia que de-negó la adopción solicitada por la señora AAR. El Art. 138 del Código Civil, supra, no padece de defectos constitu-cionales. Ante ello, su texto expresamente impide que la adopción solicitada en el caso de autos proceda.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Martínez Torres emitió una opi-nión de conformidad, a la que se unió el Juez Asociado Señor Feliberti Cintrón. El Juez Asociado Señor Kolthoff Caraballo emitió una opinión de conformidad. El Juez Aso-ciado Señor Rivera García emitió una opinión de conformidad. El Juez Presidente Señor Hernández Denton emitió una opinión disidente. La Jueza Asociada Señora Fiol Matta emitió un voto particular disidente. La Juez Asociada Señora Rodríguez Rodríguez emitió una opinión disidente. El Juez Asociado Señor Estrella Martínez emitió una opinión disidente.
— O —

 Pueblo v. Sustache Sustache, 176 D.P.R. 250, 343 (2009), opinión disidente de Rodríguez Rodríguez, J.

 En esta Opinión nos referiremos a la peticionaria, su pareja y la menor con las siglas de sus nombres y apellidos, ya que estas interesan mantener confidenciales sus nombres, según surge de varias mociones presentadas ante el Tribunal de Pri-mera Instancia, Sala Superior de San Juan.

 La influencia de Montesquieu en el proceso de redacción de la Constitución de Estados Unidos es evidente. Uno de sus principales autores, James Madison, estableció que en el tema de separación de poderes Montesquieu era “el oráculo que siempre es consultado”. (Traducción nuestra). J. Madison, The Federalist Papers, No. 47, Nueva York, Ed. Arlington House, 1966, pág. 301.

 Las críticas a la Constitución se encuentran compiladas en una publicación conocida como The Anti-Federalist Papers, disponible en R. Ketcham, The Anti-Federalist Papers and the Constitutional Convention Debates, Nueva York, Signet Classic, 1986.

 La última revisión extensiva del derecho sustantivo de la figura de la adop-ción en Puerto Rico se dio a través de la Ley Núm. 8-1995 (31 L.P.R.A. sec. 531 et seq.).

 En el aspecto procesal, la intención legislativa de la Ley Núm. 186-2009 (8 L.P.R.A. sec. 1051) fue simplificar el proceso de adopción al acortar los diversos términos existentes para que las agencias del gobierno se expresen en cuanto a una *858 solicitud de adopción. Véase Exposición de Motivos Ley Núm. 186-2009. A su vez, este estatuto procuró atemperar la institución de la adopción en Puerto Rico a los cambios sociales, permitiendo la otorgación de “acuerdos de adopción” entre madres que voluntariamente deseen entregar sus recién nacidos a personas que tengan el deseo de adoptarlos. 8 L.P.R.A. secs. 1052-1061. Por otra parte, se estableció un sistema de “refugio seguro”, mediante el cual una madre puede entregar a su recién nacido a una institución hospitalaria “de manera confidencial, sin peijuicio y sin temor de ser arrestada, procesada o enjuiciada, antes de transcurridas setenta y dos (72) horas a partir del nacimiento del infante, siempre y cuando éste no presente señales de abuso o maltrato”. 8 L.P.R.A. sec. 1062.

 Véase Apéndice de la Petición de certiorari, págs. 266-292.

 La Constitución de Estados Unidos no contiene una prohibición expresa en cuanto al discrimen por sexo. No fue hasta la década de los setenta que el Tribunal Supremo de Estados Unidos resolvió que, de acuerdo con la Cláusula de Igual Pro-tección de las Leyes de la Constitución Federal, las clasificaciones por sexo conlleva-rían un tipo de escrutinio más elevado que el de racionalidad mínima. B.A. Babcock y otros, Sex Discrimination and the Law: Causes and Remedies, Boston, Ed. Little, Brown and Co., 1975, págs. 89-129. Sin embargo, y a diferencia de Puerto Rico, las clasificaciones por razón de sexo en la jurisdicción federal son analizadas según un nivel de escrutinio intermedio. U.S. v. Virginia, 518 U.S. 515 (1996); Craig v. Boren, 429 U.S. 190 (1976). Segúffffn ese escrutinio, la clasificación debe perseguir un interés estatal importante y estar sustancialmente relacionada con ese interés. Véase L. Fisher, American Constitutional Law, 6ta ed., Durham, Ed. Carolina Academic Press, 2005, Vol. 2, pág. 833.

 De acuerdo con este principio, hemos determinado que leyes diseñadas a hacer más atractivo para los patronos la contratación de hombres sobre mujeres son inconstitucionales. Zachry International v. Tribunal Superior, 104 D.P.R. 267, 282 (1975). A su vez, declaramos inconstitucional el requisito de corroboración del testi-monio de mujeres víctimas de violación ya que cuestiona a priori la credibilidad de las mujeres. Comisión de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 739 (1980). Por su parte declaramos inconstitucional el Art. 109 del Código Civil el cual solo permitía a la ex cónyuge pedir alimentos de su exesposo. Ello ya que la excepción partía de premisas estereotipadas y arcaicas del rol de la mujer en la sociedad. Milán Rodríguez v. Muñoz, 110 D.P.R. 610, 616 (1981).

 Alegato de la peticionaria, pág. 27.

 Réplica de la Peticionaria al Alegato de la Procuradora General, pág. 3.

 Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, El discrimen por razón de género en los tribunales, agosto de 1995, pág. 4.

 Íd., págs. 4-5.

 Conviene citar el Informe de la Comisión de la Carta de Derechos a la Asamblea Constituyente. En específico, la Comisión dictó que el propósito de la cláu-sula “es reconocer el advenimiento de la mujer a la plenitud del derecho y a la igualdad de oportunidades con el hombre”. 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2561 (2003).

 Alegato de la parte peticionaria, pág. 33.

La Juez Asociada Señora Rodríguez Rodríguez propone en su disenso que adoptemos por primera vez en nuestra jurisdicción un escrutinio intermedio para atender aquellas clasificaciones que no estén prohibidas por la Constitución. Esa posición nunca ha obtenido el apoyo de una mayoría de este Tribunal y rehusamos brindárselo ahora. Véase J.J. Alvarez González, Derecho constitucional de Puerto *875 Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, págs. 816-817. Nuestra historia constitucional demuestra que el uso del escrutinio estricto ha resultado apropiado para frenar los discrímenes que están constitucional-mente prohibidos. Lo que resulta curioso es que la Juez avale un método de escruti-nio constitucional proveniente de la jurisdicción federal a pesar de sostener repeti-damente en su disenso que “[l]a Constitución que interpretamos es la del Estado Libre Asociado de Puerto Rico, no otra...”. Opinión disidente de Rodríguez Rodríguez, J., pág. 1036.

 Alegato de la Procuradora General, pág. 26.

 Conviene recordar que, según el escrutinio de racionalidad mínima, los tribunales no están obligados a encontrar expresamente en el estatuto la justificación que utilizó el legislador para establecer la clasificación. Por esa razón, según este tipo de escrutinio, “[l]a ley será constitucional siempre que razonablemente pueda concebirse una situación que justifique la clasificación”. (Enfasis omitido). Berberena v. Echegoyen, 128 D.P.R. 864, 879 (Í991). Como comenta el profesor Alvarez Gonzá-lez, “bajo el criterio de racionalidad mínima poco importan las razones que efectiva-mente movieron a la Asamblea Legislativa a hacer la clasificación; lo realmente pertinente es si puede concebirse alguna razón, siquiera hipotética, que pueda justi-ficar el juicio legislativo”. J.J. Alvarez González, Derecho constitucional, 61 (Núm. 4) Rev. Jur. U.P.R. 637, 784 esc. 758 (1992).

 Desde hace siglos se ha reconocido el interés del estado en regular aspectos de la organización familiar. Véase M. Grossberg, Governing the Hearth, Chapel Hill, University of North Carolina Press, Chapel Hill, 1985, págs. 3-30. Obviamente, lo determinante es que la intervención estatal no interfiera con derechos protegidos por la Constitución.

 Alegato de la peticionaria, pág. 33.

 Véase, por ejemplo, el requisito de seis (6) meses de residencia ininterrum-pida, 31 L.P.R.A. sec. 531, el requisito de matrimonio para parejas que deseen adop- *880 tar conjuntamente, cuya constitucionalidad fue sostenida en Pérez, Román v. Proc. Esp. Reí. de Fam., 148 D.P.R. 201 (1999); la prohibición de adoptar personas que hayan contraído matrimonio, cuya constitucionalidad sostuvimos en López v. E.L.A., 165 D.P.R. 280 (2005), y el requisito de que el adoptante sea catorce (14) años mayor que el adoptando, 31 L.P.R.A. sec. 531.

 Hemos reseñado el derecho federal vigente. No obstante, somos conscientes de que el Tribunal Supremo federal expidió autos de certiorari en los casos de Hollingsworth v. Periy, Docket No. 12-144, y United States v. Windsor, Docket No. 12-307. Ambos contienen controversias constitucionales en las cuales nuestro más alto foro potencialmente puede pautar normas que alteren ese derecho vigente.

 Esta figura es análoga, en caso de parejas heterosexuales, a la figura de adopción sucesiva reconocida en el Art. 138 del Código Civil, 31 L.P.R.A. sec. 539. A través de esta, el padre biológico mantiene los vínculos jurídicos con su hijo y el padre adoptando asume los vínculos del otro padre.

 A contrario sensu, otros tribunales estatales han permitido el uso de la figura de Second Parent Adoption luego de interpretar que esta no va en contra de las disposiciones estatutarias de adopción. Por ejemplo, en In re Adoption of Tammy, 619 N.E.2d 315 (1993), el Tribunal Supremo de Massachusetts interpretó que el ordenamiento legal de ese estado no requería que se dieran por terminados los vín-culos filiales de un menor con su padre biológico en casos en que ese padre fuera parte del proceso de adopción.

 La cita original en inglés lee: “Members of this Court are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation’s elected leaders, who can be thrown out of office if the people disagree with them. It is not our job to protect the peoplefrom the consequences of their political choices”.